AMERICAN VETERINARY LABORATORIES, RESPONDENT, v. CAMPBELL PAINT AND VARNISH CO., APPELLANT.—59 S. W. (2d) 53.

Kansas City Court of Appeals. March 6, 1933.

*Cowgill & Popham, John F. Cook* and *Morrison, Nugent, Wylder & Berger* for respondent.

*Henry S. Conrad, L. E. Durham, Hale Houts* and *Spurgeon L. Smithson* for appellant.

BLAND, J.—This is an action for wrongful death. There was a verdict and judgment in favor of plaintiff in the sum of $5,000 and defendant has appealed.

The facts show that about 4:10 P. M. of November 19, 1927, one Harry Melburn Rainwater, a minor fifteen years of age, came to

his death upon an elevator owned by the defendant. Deceased was employed by the plaintiff and the suit is brought under the provisions of section 3309, Revised Statutes 1929, being the subrogation section of the Workmen's Compensation Act. Plaintiff claims the right to maintain this action by virtue of having paid the parents of deceased the sum of $2600, as compensation under said act, on account of the death of their son.

The facts further show that plaintiff conducted a veterinary laboratory and supply business on a portion of the fifth floor of the building located at 1529 Walnut Street, in Kansas City; that it occupied the premises on that floor as the lessee of the defendant; that the other floors of the building were rented or leased by defendant to other tenants; that the building was equipped with one passenger elevator, located at the front of the building, two freight elevators, situated near the rear, and a stairway, also at the front, all of which were used by the various tenants and their employees. The freight elevators were connected with a dock on the ground floor. The doors at the dock were locked from the inside and could be opened therefrom, but during the time that defendant's employees operated the freight elevator the doors remained unlocked. Defendant maintained an elevator operator during the week days with the exception of Saturday afternoons. It was on Saturday afternoon that the death occurred. It appears that probably all of the tenants, save plaintiff, had closed their places of business and that their employees had left at the time of the death.

Deceased was employed as an office, messenger and delivery boy by plaintiff. He was killed upon one of the freight elevators which opened upon the premises leased to plaintiff, after the operator of the elevator and the building superintendent had left the building. Other employees of plaintiff were in the habit, and it was their custom, to operate the elevator in question on Saturday afternoons after defendant's operator left, for the purpose of carrying freight to the dock at the rear of the building. The elevator in question was not customarily used for passenger service except on occasions when the passenger elevator was broken down and the freight elevator was in charge of defendant's operator. When the freight elevator in question was not in charge of defendant's operator plaintiff's employees customarily used the stairway, if the passenger elevator was not in service manned by an operator, unless such employee had freight or packages to transport, in which case he would use the freight elevator upon which deceased was killed.

We have spoken of two freight elevators on the premises but the only one involved in the case is the one upon which deceased was killed, as plaintiff and its employees did not use the other elevator. The freight elevator in question was located at the rear of the building and faced toward its rear or to the east and was situated about

twenty or twenty-five feet from the east wall. The passenger elevator was not running at the time of the casualty, but the stairway was open. There was a front exit from the building from the stairs. This exit was open but the entrance doors to the dock below were closed and locked.

The freight elevator in question was operated within an enclosed shaft and when there was no elevator man in charge it was moved or operated by pulling upon a cable within the shaft. When it was not at a given floor it could be brought there by reaching into the shaft and pulling upon the cable. About nine inches from the front of the elevator was situated a fire door made of corrugated iron, which, when raised, coiled itself upon a drum at the ceiling about fourteen feet above. There were springs at the drum acting as a balance or counter-balance. The door was raised and lowered by hand by the use of a handle at its bottom and was not controlled automatically or otherwise by the elevator. This door had been out of order for sometime and had been worked on by defendant in an effort to fix it, but it remained in its defective condition at the time of the death in question. The defect in the door consisted in its failure to stay up unless it was raised to a point seven or eight feet above the floor. Unless it was raised to this point it would gradually settle down.

Between the fire door and the elevator, and adjacent to the latter, there was a wooden gate fifty inches in height and five feet in width. Its weight is not given. It was raised by means of a rope attached to its middle at its top and extending some distance above, perhaps to the ceiling. It was operated in a four inch track with a counterbalance weight housed in the track on the north side of the opening. When the gate was down it was necessary to raise it by hand with the use of a ratchet. When the elevator was stationary at the floor the gate could be raised to the ceiling and by reason of the operation of the ratchet it would remain open and stationary without being held by any person. However, as soon as the elevator left the floor, either up or down, the gate would immediately fall, the apparatus causing this action being controlled automatically by the rise or descent of the elevator. Unless the elevator was immediately at the floor the gate would not stay up unless held by some one. If the elevator was at another floor it could be brought to the fifth floor by raising the gate and reaching into the elevator shaft and manipulating the rope or, perhaps by reaching over or through the gate and doing the same. The usual and proper way to stop the elevator at a floor was to raise the gate, if it had not already been raised, reach into the shaft and take hold of and manipulate the cable. There is no evidence of any defect in the wooden gate or in its operation. The fire door did not work automatically with either the gate or the elevator.

As was his custom, defendant's operator of the freight elevator in question closed it down about noon of the day of the casualty, at which time he turned out the light in the elevator. This light was attached to the cross-head at the top of the latter and was always burning when the elevator was in charge of the operator. There was a 200 candle-power electric light ten feet north of the elevator in question, which shed its light in front of the latter so that one could read a newspaper immediately in front of it without effort. This light also reflected somewhat upon the gate. However, there was positive evidence that when the light in the elevator was turned out it was dark therein and that it was also dark in the shaft immediately under the elevator as the elevator proceeded on upward toward the sixth floor. The fact that it was light immediately in front of the elevator and dark in the shaft and in the elevator was, no doubt, due to the fact that the light in question did not shine into the elevator, but was to its side and that there was an obstruction in the room in the way of a post, or other structure, immediately north of the elevator extending somewhat out toward the east.

Deceased had been employed by plaintiff about three months prior to his death. He was in good health and large for his age. No one had ever seen him operate the elevator before. So far as any of the witnesses knew no one had instructed him to use it under any circumstances. In other words, they did not assume to say that he had not used it or had been instructed in any manner about it. Three employees of the plaintiff testified but they were not the only employees of plaintiff, the others being away the Saturday afternoon that deceased was killed.

No one saw any part of the happenings giving rise to the death of deceased. Deceased had been instructed by one Kovar, an employee of plaintiff, to take a package to the union station. Kovar testified as follows in reference to this matter:

"Q. Mr. Kovar, at the time of Melburn's death, I will ask you to state to the jury whether or not it is a fact that Melburn had some packages to deliver at the union station at that time? A. He had one package; it was addressed to Dr. L. C. Adkinson at St. Paul, Kansas.

"Q. He had been told to deliver that to the union station? A. Yes, sir.

"Q. That was a part of his duties? A. Yes, sir."

This package was a four bottle carton containing hog cholera serum and weighed approximately ten or twelve pounds. Apparently Kovar gave the package in question to deceased a short time before the boy met his death, but there is no direct testimony as to how much time elapsed between these two events.

Kovar testified that he was situated ten or fifteen feet south of the elevator making some vaccine when he heard a "sort of a scrap-

ing sound on the floor—naturally it is quiet there—most of our employees were gone for the day, so I turned around and I say (saw) a foot scraping this floor and as I looked further I saw a body laying over the edge of the elevator. Now, when we were boys, you remember, when we were trying to climb over a fence, we tried to get a toe hold. That is what this body—or this boy had been doing when I noticed him. He had one foot up on the elevator and I couldn't see the other. It was out of sight, but this other one was dangling there and just was leaving the floor—and the two floors (doors) the inner wooden gate toward the elevator and this corrugated door that we are speaking about were both on his back there, and both of them going up with the elevator.'' He further testified that at the time he first saw what was happening the elevator was about two and one-half feet above the floor and moving upward.

It developed that the witness had given testimony before the coroner in which he stated that the fire door had not descended down to deceased at the time the witness first saw what was happening, and his memory being refreshed at the trial he corrected his testimony, and upon cross-examination and re-direct examination he stated, positively, that the fire door had not reached deceased at the time he first noticed the situation, but was ''pretty close to it'' and that as the elevator continued to ascend the door came in contact with the back of deceased.

When the witness saw the situation he ''hollered'' to another employee by the name of Keleher. Keleher testified that when Kovar ''hollered'' the witness started down the aisle as fast as he could and as he turned the corner to go around in front of the elevator he tripped upon some mail sacks that he had left there a short time before and fell on his stomach. From this position he grabbed the cable and pulled it as hard as he could. He was not able to say whether he stopped the elevator. However, either he or another employee, one Gobel, or both, did stop it. At the time Keleher arrived the elevator was higher than the witness' shoulders and the wooden gate and the fire door were upon the deceased and all were moving upward. The body of deceased was lying upon the elevator platform and his feet were ''sticking'' out toward the east. The witness had passed the elevator but a few minutes before, but he was unable to say definitely whether the fire door was up or down at that time, but he thought that it was down.

Gobel testified that he was in an adjoining room and heard a commotion at the elevator; that he came out and saw Kovar and Keleher there; that at that time the elevator was up out of sight; that when he arrived there he pulled the rope and let the elevator down; that after the elevator came down the body of deceased fell from above on to the elevator floor.

While Keleher and Gobel were attempting to get the elevator stopped and reversed, Kovar heard the wooden gate breaking up. This was apparently due to the fact that the wooden gate had become wedged between the body of deceased and the ceiling above. When the elevator was stopped the floor of the elevator was beneath the body of deceased and a bevel metal piece attached to the ceiling, as a guard for the upper floor, was on his back and he was caught between this guard and the elevator. At the time that deceased's body dropped to the floor of the elevator the witness Gobel noticed a few packages "scattered around the elevator there." These packages were six or eight inches square or larger. The witness could not say how much they weighed. Keleher testified to seeing some mail laying on the floor, which was apparently these packages. This mail was not on the elevator but just outside and ready for mailing.

The petition charges that the iron door was defective; that it would not stay up when raised but would gradually sink and come down, fall and entrap persons attempting to use the elevator; that the wooden gate was defective because it would not stay in place when raised and that the elevator shaft and entrance to the elevator was not sufficiently lighted. The petition also charges negligence on the part of the defendant by reason of not having an operator in charge of the elevator. But this last allegation was abandoned, as it was not submitted in plaintiff's principal instruction. [Phillips v. Ry. Co., 226 S. W. 863, 864, 865.]

Defendant insists that the court erred in refusing to give its instruction in the nature of a demurrer to the evidence. Defendant admits that it, as landlord, was under a duty to maintain that part of the premises reserved by it and used in common by the various tenants and their employees of the building and admits that, had deceased been using, or attempting to use, the elevator for the purpose of transporting freight he would have maintained the relationship of invitee to the defendant, and defendant would have owed him the duty to maintain the elevator in a reasonably safe condition and would have been liable on a showing that deceased was injured through any negligent failure of it to perform that duty that proximately caused his death. However, it is contended that deceased was not using it as a freight elevator, but for his own purposes, regardless of whether he intended to carry the packages given him by Kovar down the elevator, of which defendant says there is no evidence.

There is sufficient in the evidence from which the jury could have reasonably inferred that deceased was not only attempting to carry out the package that Kovar had given him, but that he was also attempting to take from the building the other packages that were scattered in front of the elevator after the casualty. It was one of deceased's duties to remove packages of this sort for the purpose of

mailing or express. It is not reasonable to suppose that these packages would have been left at the entrance to the elevator if it had not been for the purpose of removing them from the building for mailing or express. In fact Keleher testified that they were ready for mailing.

It is true that no question was asked of the witnesses as to whether any one of the packages on the floor in front of the elevator was the one that had been given to deceased for the purpose of being taken to the union station. But there is no other explanation in the evidence as to why deceased was attempting to use the elevator, unless he intended to use it for a pleasure ride, save that he was taking the packages to the union station as he had been directed a short time before by Kovar.

It is unreasonable to suppose that the other packages, or those ready for mailing, would have been put on the floor *in front* of the elevator where it would be necessary for persons, using the elevator, or the passageway in front of it, to go. There had been two mail sacks placed, not in front of the elevator but at its *side or corner*, by Gobel for the purpose of being mailed (not by deceased) and, this circumstance tends to show that, at least Gobel, among the employees, realized the impropriety of placing obstructions in the passageways and, had any person placed the packages in front of the elevator, other than deceased himself at the time he was attempting to operate it, it would have been an act of carelessness, as the packages would have been put in a passageway that necessarily would have been used by those boarding or leaving the elevator, if not by those using the passageway in front of the elevator not intending to use the latter. No such presumption is to be indulged in, but rather to the contrary. [Cech v. Chemical Co., 20 S. W. (2d) 509.]

We are therefore, of the opinion, as before stated, that it was competent for the jury to draw the inference that deceased was attempting to take all of the packages out of the building by the use of the elevator in question at the time he was killed. They probably became scattered in the excitement after deceased was discovered in his perilous situation, if not before by his struggles to push himself further upon the elevator. While the evidence shows that the elevator was to be used for freight only, under the circumstances existing at the time in question, it further shows that the word "freight" also included packages such as these. The following testimony on the part of Goble is enlightening upon this subject:

"Q. Now, this elevator there was used by your company when there were packages or articles to be taken in and out of the building, wasn't it, this freight elevator? A. That is what they used it for.

"Q. That is what they used it for? A. Yes, sir.

"Q. And when this accident occurred you saw a lot of packages scattered around there, part of them on the elevator and part of them out?

"Mr. Smithson: That is objected to as leading, if the Court please.

"The Court: It is leading.

"Q. What did you see around the elevator there? A. A few packages.

"Q. And you say that that freight elevator was used for carrying packages and freight? A. I don't know what you consider—freight or packages I imagine would be the same.

"Q. Was it used for that purpose? A. Freight.

"Mr. Smithson: Used for hauling freight? A. Yes, sir."

Defendant's witness, Harnden, its superintendent, testified: "Q. You knew that they used that freight elevator for carrying packages? A. Yes, sir." Defendant in its reply brief admits:

"No doubt, the transportation of many small packages, more than could be carried by hand, would be a use of the elevator for freight purposes, just as the transportation of one package too large for handling, would be a freight use."

It is insisted that deceased had never been authorized or instructed to operate the elevator. There is no evidence of this, but there is evidence that no one had seen him operate it or had heard anyone instruct him to or not to use it. This does not necessarily support the contention that he had not been authorized to do so. The three employees of plaintiff who were there at the time of the casualty testified at the trial, but they were not all of plaintiff's employees. Evidently there were other employees of higher authority than these. From his title it would appear that the witness, Gobel, perhaps, was the highest employee in authority on the premises at the time, and his title was that of assistant chemist. However this may be, the evidence shows that the employees, generally, customarily used this elevator for freight purposes and, under the circumstances existing at the time of the casualty, it makes no difference whether deceased was seen using the elevator before or not or, in fact, whether he ever did use it for, by reason of custom, the defendant knew, acquiesced and assented to its use for carrying freight, which included packages of this kind, and deceased had a right, in the absence of instructions to the contrary, to use it even though he had first come upon the premises as an employee only a few hours before he was killed.

We have examined the authorities cited by defendant on this point, including the case of Stagg v. Tea & Spice Co., 169 Mo. 489, but they are cited in support of defendant's theory of the facts of this case, which theory, as we have already indicated, does not com-

port with the actual facts as shown by the record. The authorities, therefore, are not in point.

It is insisted that there is no evidence tending to show that the death was proximately caused by the negligence of the defendant; that the cause of the death, or the injury bringing it about, is a matter of speculation. In this connection defendant says:

"It is a matter of pure speculation and conjecture as to whether he stepped or attempted to step upon the elevator as it rose and slipped, whether he merely lifted the wooden gate and reached in to pull the cables by which the movement of the elevator was controlled. It does not appear whether the elevator was stationary or moving when he first touched it or when he first came into difficulty or danger. It does not appear whether he slipped or whether he was struck or whether the wooden gate in any wise caused or contributed to cause him to fall or come down upon the platform of the elevator."

It is further contended by the defendant that the defect in the fire door did not contribute as one of the proximate causes of the death. Taking up the last contention first, the corrected testimony of the witness Kovar shows that the fire door was not touching deceased at the time the elevator reached a point two and one-half feet above the floor. It must be admitted that this fact, alone, would not establish that the fire door had nothing to do with his falling, as, if the evidence had shown it, it could have struck him, knocking him down, while he was in an erect or partially erect position and his body could have fallen faster than the door. But there is no evidence that the fire door would descend with either sufficient force or suddenness to knock down deceased and entrap him. It would have been quite a coincidence had the door struck him just as the elevator reached a proper position for him to fall upon it, especially in view of the fact that the elevator came from below the fifth floor, a matter hereinafter discussed. It would appear that if the fire door had started to fall, its descent being gradual, deceased would have had ample opportunity to get from under it before it struck him, even if it were heavy enough to knock him down. No doubt it was that heavy but its heaviness was rendered innocuous by the counter springs that let it down but slowly. We will not presume that deceased was negligent himself, as he would have been had he failed to escape being felled by the fire door as it settled down. [Cech v. Chemical Co., supra.]

There is no evidence as to what force would be necessary to raise the fire door to a point even with the head of a person attempting to operate it. There is evidence that when the operator wished to get it high enough so that it would not automatically descend he would have to "throw" it above his head and that a force of more than nine pounds would be necessary in order to do this. But every one knows that it takes more strength or force to do such an awkward thing as to "throw" a heavy iron door above one's head than to raise it to

the level of the shoulders. The testimony that we have reference to was given after counsel and the witness had made experiments with the elevator during the trial. It is as follows:

"Q. How much strength does it take to raise—how many pounds would you say, from the bottom here to throw it up to where it will catch? Did you try it? A. I tried it, yes; so did you; it wasn't a hard job, was it?

"Q. Well, it required a good deal more than eight or nine pounds, didn't it, Mr. McLaughlin? A. Well, probably, yes.

"Q. You couldn't always throw it high enough to make it catch up there, could you, by exerting all your strength on it? A. No. You throwed her clear to the top. There is only one place that the door locks at the top.

"Q. There is only one place that it locks, and that is at the top? A. Yes, when it is hanging at the center.

"Q. It took all the strength you had and all the strength I had to raise it this way? A. No, you know you raised that door yourself a dozen times there, yes, sir, and you throwed it up five feet when you would come down twenty-two inches. I sat on the floor and let it strike me on the head again at five feet; it wasn't coming down with any force. . . .

"Q. As I understand you, when this was put above your head and allowed to come down upon your head, it didn't come down with enough force to hurt your head at all? A. You wouldn't hardly know it was touching me."

The testimony shows that, at the time of the trial, the fire door "works a little bit harder" than it did at the time of the casualty, but there is no testimony tending to show that, at the latter mentioned time, it came down with sufficient suddenness to fell anyone.

We will not presume, in the absence of evidence, that deceased attempted to board the elevator while it was in motion, or without knowing whether it was or not, for to do so, would convict him of negligence. [State ex rel. v. Haid, 28 S. W. (2d) 97; Cech v. Chemical Co., supra.] And in the absence of direct evidence showing that he was guilty of negligence we will not conclude that he was unless all of the physical facts, there being no eye witnesses, conclusively establish that he was.

It is true, as contended by defendant and as held in the case of State ex rel. v. Cox, 298 Mo. 427, that in the absence of testimony showing negligence of either party, both defendant and plaintiff will be presumed to be in the exercise of ordinary care; that one presumption neutralizes the other, so there is left no presumption whatever, for or against either. In that case there had been a recovery in the trial court where the death of a man had been occasioned by an electric shock, but no one saw the happening. There was no evidence of any negligence on the part of the defendant causing the death

and the court refused to permit the jury to infer negligence solely by reason of a presumption that deceased was not guilty of contributory negligence, holding that there was a presumption of innocence on both sides. But here one, at least, of the acts of negligence charged against defendant, and submitted to the jury by plaintiff, was established by direct evidence and so it was not based upon any presumption. That charge of negligence was the absence of light, or adequate light, in the elevator.

No doubt the jury found that the elevator was not standing at the fifth floor when deceased approached it for he had no reason to operate it upward. His course was down and out of the building to mail or express his packages. In addition, the reasonable conclusion to be drawn from the testimony is that deceased could not have fallen on the elevator the way he did if the elevator was stationary at the time he approached it, unless he manipulated the rope and moved it upward before he attempted to board it, which clearly would have made him guilty of contributory negligence, as a matter of law. The physical facts show that he did not attempt to board the elevator while it was in motion for had he done so the packages in his arm or hand (in view of the position in which he fell) would have fallen on the elevator, not in front of it. Of course, had he boarded the elevator while it was in motion he would have attempted to take the packages on the elevator with him. The position of the packages on the outside of the elevator shows he did not follow that course. When he approached the elevator it evidently was on some floor below, perhaps the first floor, for it would have been natural for the operator to have left it there when he turned out the light in the elevator and "shut it down."

The wooden gate could have had nothing to do with the fall of deceased. The most reasonable and logical conclusion to be drawn from the facts and circumstances is that deceased approached the elevator shaft with the packages in one or both of his arms; that the wooden gate was down, because it would not stay up except when the elevator was standing at the fifth floor; that he placed the packages upon the floor in front of the elevator or retained them in one arm and raised the fire door, if it was down, and then placed the packages on the floor, raised the wooden gate and held the latter up by one hand, while he reached for the elevator rope or cable with the other. It was proper for him to pursue either course but whether the fire door was down or up is entirely immaterial. He then reached into the shaft in order to manipulate the rope. He must have raised the gate before the elevator arrived and he must have put the packages on the floor, for the reason that he could not hold the packages in one arm or hand, open and hold open the wooden gate with the other and stop the elevator by the use of the rope all at the same time.

It required the free use of two hands to hold up the gate and stop the elevator. It was necessary for him to open the gate, which the facts show he did, to board the elevator and it was proper and customary, if not necessary, for one to open it in order to stop the elevator. There is no doubt but that he opened the wooden gate with one hand, either when he first came to the elevator shaft and manipulated the elevator rope, or raised it as the elevator approached the floor, so that he might reach in and grab the rope and stop the elevator at the floor. There was no other way for him to stop the elevator except to reach in and take hold of the rope. So whether he could have reached through or over the gate to manipulate the cable is not material. The fact that he opened the gate is established by the physical facts.

The evidence shows that it was necessary to manipulate the rope just prior to the elevator's arriving at the floor in order to stop it there. While deceased probably did not see or see well enough into the elevator shaft as the elevator approached to discern more than its general outline, no doubt, he saw enough, together with the noise as it approached, to know approximately where it was. As the elevator approached deceased undoubtedly stood there, with the packages upon the floor, holding on to the wooden gate with one hand and reached into the elevator with the other for the purpose of stopping it, but by reason of the darkness was unable to see distinctly the rope or cable therein. He no doubt attempted to grab the cable and, while in the act of reaching for it, leaned forward, lost his balance and fell. When he fell, deprived of his supporting hand the wooden gate fell striking him on the back. The elevator all of this time was proceeding upward. How much of deceased's body fell upon the elevator is a matter of speculation and immaterial. Likely less of it was on the elevator at the time he fell than when Kovar heard him, because at that time deceased was attempting to push himself forward on to the elevator by use of the one foot that was dragging or scraping. After the gate fell he, no doubt, attempted to get all of his body upon the elevator but he was pinioned between the gate and the elevator floor and was unable to escape.

There is no evidence tending to show that anything could have happened to cause his death until the gate crashed against the ceiling, causing it to break up, and it was either the breaking of the gate, or the jamming of his body between the elevator floor and the beveled piece of metal at the ceiling that brought it about.

We are not saying, as a matter of law, that the casualty happened in the way that we have detailed, but we do say that it is a reasonable explanation of it and one that it was within the province of the jury to adopt. If it happened in that manner there is no question but that the absence of light in the elevator was the proximate cause

of the death. This theory seems to us a reasonable one, if not the only rational one that can be evolved, concerning the casualty, that does not consider the possibility that deceased was negligent and, as we have before stated, a presumption of this kind will not be indulged in and the physical facts do not establish it as a matter of law.

Neither do we think that this theory conflicts with the rule that a presumption or inference will not be built upon another inference or presumption in order to inflict liability. The established facts and circumstantial evidence point strongly to the fact that deceased intended to take the packages down by means of the elevator. To do this he was required to stop it at the fifth floor. Other facts and circumstances tend to show that he was attempting to stop the elevator at the fifth floor in order to board it when he fell. There is no reasonable likelihood that either the gate or the fire door knocked him down. There is no evidence of any slickness of the elevator landing on the fifth floor where deceased was standing at the time he attempted to stop the elevator which might have caused him to fall, or of any obstruction that he might have stumbled over. It is true, the packages were there, but he knew of these, having placed them there himself. It likewise is true, that we must infer from all the facts and circumstances, what were the actions of deceased at the elevator. It may be that in order to arrive at our theory of the facts in this case we must infer that he attempted to stop the elevator, but it is not building an inference upon that inference to say that he did not stop it. The fact that he did not stop it is established by the physical fact that it proceeded upward. The fact that we infer that he attempted to stop it is established by all of the circumstances in the case and is not built upon an inference. The cause of his failure to stop it is another thing but his failure to stop it is not based upon inference that he attempted to stop it but it is based upon an established fact substantiated by direct testimony, that is, that it was dark in the elevator. The fact of darkness raises an inference that he could not see or see well enough to locate the exact position of the rope and grasp it or grasp it securely. As many inferences as the facts establish, either by direct or circumstantial evidence, may be drawn as those facts will justify so long as an inference is not based upon another inference or inferences. [Freeman v. K. C. Public Service Co., 30 S. W. (2d) 176.]

We have not overlooked the rule relied upon by defendant, that where the evidence shows that the death may have resulted from one of two causes, for one of which, but not the other, defendant would be held liable, plaintiff must show, with reasonable certainty, that the cause for which defendant would be liable was one of the proximate causes of the injury. In other words, that it must be shown with reasonable certainty that the cause of the injury was due to the negligence of the defendant, and this must not be left to speculation.

However, plaintiff's evidence need not exclude the possibility of accident or of a cause for which defendant is not liable, but it is sufficient to make a submissible case if there is substantial evidence that the injury resulted from a cause for which defendant is liable. [See State ex rel. v. Haid, supra, 1. c. 102, 103.] From the theory of facts that we have evolved, supra, it is quite apparent that there was ample evidence of a substantial nature to fix liability on defendant.

We have examined the case of Hamilton v. Railway, 318 Mo. 123, and like cases cited by defendant and find them not in point. In that case plaintiff proceeded upon the theory that deceased was struck by a spout of a water tank which the locomotive passed before it reached a bridge a short distance from the tank. Deceased had been walking along the running board on that side of the engine and he could have been struck by the water spout if it extended low enough toward the engine; but there was no substantial evidence that it was low enough to strike him and the facts indicated that it was more reasonable to suppose that he had been struck by the bridge. The matter as to whether the water spout was low enough to strike deceased was not fully established. On the other hand, in the case at bar, there was ample testimony on the part of a number of witnesses of the lack of light in the elevator in question.

It is insisted that deceased was guilty of contributory negligence, as a matter of law, because he should not have attempted to use the elevator, but should have used the stairs. In this connection it is again insisted that it is impossible to infer from the evidence that either the fire door or the insufficiency of light had anything to do with the casualty. In other words, the contention is based upon similar contentions made in connection with the point that the demurrer to the evidence should have been sustained. Our ruling on the demurrer to the evidence should dispose of the present contention of defendant.

However, it is quite apparent that deceased was using this elevator just as others had done before him. That it was a custom to use it in this way of sufficient long standing to have been brought home to defendant is not disputed. It would have been awkward, if not burdensome, for anyone to have carried these packages down the stairway. Deceased was barely fifteen years of age. We think there can be no question that he was not guilty of contributory negligence, as a matter of law. We have examined the case of Stagg v. Tea & Spice Co., supra, and like cases cited by defendant and find them wholly inapplicable to the facts in the case at bar.

It appears that deceased was working without an employment certificate, as provided by the Child Labor Laws then in force (see Laws 1921, pp. 184, 188), and it is contended by defendant that his parents were guilty of contributory negligence, as a matter of law, in per-

mitting their son to work under the circumstances; that plaintiff, also, violated the law in employing him and, therefore, was likewise guilty of negligence proximately causing the death, and, consequently, there can be no recovery in this case on the part of either the parents or plaintiff.

Plaintiff in bringing this suit under the subrogation statute of the Workmen's Compensation Act (Section 3309, R. S. 1929), occupies a position no different than the parents would have maintained had they brought the suit. In a recent case the Supreme Court said:

"It is evident, that, if the injured employee chooses to bring his own action against the negligent third party, in part at least for the benefit of the employer, or if he and the employer join in such action, it would not be competent for such negligent third party to interpose as a defense the negligence of a joint tortfeasor, though it be that of the employer." [General Box Co. v. Mo. Utilities Co., 55 S. W. (2d) 442, 446.]

It is true that the violation of the Child Labor Law is negligence *per se* and is to be regarded as a proximate cause of an injury of this kind, unless some other negligence intervenes and becomes, to the exclusion of the violation of the act, the proximate cause of the injury or death. [Mylett v. Cloak & Suit Co., 211 Mo. App. 635; Buffum v. Woolworth, 221 Mo. App. 345.] But we think that the negligence of defendant, if not that of plaintiff in failing to provide deceased with a reasonably safe exit from its premises, intervened and isolated the act of negligence arising from the act of employing deceased, so as to become the proximate cause of his death, rather than such employment. [Beebe v. K. C., 17 S. W. (2d) 608; Dugdale v. St. Jos. Ry., etc., 189 S. W. 830.] In the latter case this court cited with approval the case of Dickinson v. Stuart Colliery Co., 17 W. Va. 325. We said of the Dickinson case (1. c. 834) that it involved a statute which "forbade a minor working in a mine, and made it a misdemeanor on the part of both the parent and employer to permit him to do so. A minor son was working in the mine and was killed. The father was denied relief upon the ground that the unlawful employment was the proximate cause of his son's death, and such employment was the only evidence of negligence on defendant's part and to this the father contributed by consenting to the unlawful employment. But the court said that, had the death been caused by some other fault of the defendant, and shown to have been the proximate cause, the act of the father in consenting to the unlawful employment—'could not be regarded as the proximate cause, for in that event the employment would not have been the last or causing cause.' " In the Dugdale case we held that the negligence of the street car company in maintaining obstructions in the street was the proximate cause of the death of plaintiff's son and not the violation

of the Child Labor Law by the father. The son ran his father's wagon into the obstructions. He was driving it to the stockyards to get some hogs for his father, at his father's direction.

The case of Buffum v. Woolworth, supra, does not discuss the question as to whether the negligence of the employer, causing the injury to the employee, may so intervene so as to cut off or isolate the negligence in the employment itself, so as to make the first mentioned negligence the proximate cause of the injury. Although, that case did involve not only employment contrary to the Child Labor Law but other negligence on the part of the defendant. However, we disposed of that case upon the theory presented to us by appellant (defendant). Appellant contended that the employment of plaintiff therein was not prohibited by statute, but the statute was merely regulatory in its nature and, therefore, the employment was not negligence *per se* and, it was further contended that the conditions and circumstances actually bringing about plaintiff's injury did not constitute negligence upon the part of the defendant. We decided both of these contentions against the defendant, but did not discuss the matter of intervening negligence, as the point was not raised.

Complaint is made of the action of the court in overruling defendant's objection to the introduction into evidence of the lease between plaintiff and defendant, which among other things, provided that defendant should operate the elevators until 6:30 P. M. on all days of the week except Sundays and legal holidays. The court permitted the introduction of this lease but before doing so it sought to have counsel for defendant admit that at the hour of the death of deceased defendant was in control of the elevator, but counsel for defendant refused to admit further than that the elevator was furnished by defendant during regular hours of the operation thereof. The evidence, as before stated, shows that the operator quit on Saturday at noon. As counsel for defendant refused to admit that it was the duty of defendant to furnish the elevator at the time deceased met his death, it was competent to introduce the lease in evidence. We do not put this holding upon the belief that plaintiff had any right to base its cause of action on the ground that defendant failed to comply with its lease in this respect for, of course, plaintiff had no such right. [See Degnan v. Doty, 246 S. W. 922.] However, the lease was competent for the purpose of showing the relationship between the parties at the time of the death. As was said in 36 Corpus Juris, p. 210:

"An action will lie to recover for personal injuries when based upon the negligent failure of the landlord to repair according to his contract. In such a case, the right of recovery does not depend or rest upon the breach of the covenant to repair but upon the negligent failure of the landlord to perform a duty which he owes to his tenant amounting to a tort. His liability does not rest upon contract but

upon negligence, the contract to repair being a mere matter of inducement from which arises his affirmative duty to exercise care as to the condition of the leased premises."

This theory of the law is followed, substantially, by the Supreme Court of Missouri in the late case of Braun v. Riel, 40 S. W. (2d) 621.

Complaint is made of the giving of plaintiff's instruction No. 1. This instruction reads as follows:

"The court instructs the jury that this action is brought by plaintiff for reimbursement for money paid to the parents of decedent under the Workmen's Compensation Act and for the benefit of such parents on account of pecuniary loss sustained by them from the death of their son, and if you believe from the evidence that prior to and at the time of said death defendant was in charge and had control of the building and elevator referred to. in evidence and that plaintiff was the employer of decedent and a lessee of part of the fifth floor of said building and as such tenant made use of the elevator in question, if you so find, and that on November 19, 1927, on the occasion in question decedent Harry Melburn Rainwater as an employee of plaintiff attempted to use said elevator in the performance of his duties as such employee, if you so find, and in so doing and at all times referred to in evidence used ordinary care for his own safety, if you so find, and that the door thereof was out of repair and defective and dangerous and not reasonably safe for ordinary use at said time and would not work and hold in the way and manner as placed and intended, if you so find, and by reason thereof was dangerous and not reasonably safe for ordinary use, if you so find, and that said elevator shaft and the premises thereat and thereabout on said fifth floor at said time were unlighted and dark, if you so find, and by reason thereof were dangerous and not reasonably safe for the ordinary use of decedent and persons using same and the employees of plaintiff, if you so find, and that said conditions and dangers, if you so find they existed, remained and existed long enough prior to said occurrence that defendants knew or by the use of ordinary care could have known thereof at and prior to the said occurrence and long enough prior thereto by the use of ordinary care to have made said gate reasonably safe and provided reasonably sufficient light thereat, if you so find, and that defendants failed to use ordinary care so to do and were thereby guilty of negligence, if you so find, and that as a direct result thereof while decedent was so about said elevator and so attempting to use same, and in the exercise of ordinary care for his own safety, if you so find, was caught by said descending door, if you so find it did descend, and was thereby killed, if you so find, then your verdict must be for plaintiff and against defendants."

This case was a very difficult case on the facts to fathom, if not a close case, and the theory of liability on the part of the defendant

should have been clearly and unambiguously submitted to the jury. This instruction gave prominence to an issue that was not in the case and calls attention of the jury to a matter as causing the death that had nothing whatever to do with it. The facts of this case make it difficult to arrive at any conclusion as to the cause of the death. It was hard enough for the jury to arrive at a verdict for plaintiff without having their attention directed to the probability that deceased was caught and killed by the fire door, when there is no evidence whatever to support any such theory. The inferences to be drawn in this case are so complicated that plaintiff, itself, persists, at this late date, in insisting upon this erroneous theory of the casualty. It was, therefore, improper to submit to the jury, that deceased was caught and killed by the descending fire door. It was a false issue and should not have been referred to in such a manner in the instruction, as it only tended to confuse the jury. Under all of the circumstances, we think that the instruction was reversibly erroneous. [Rice v. Jeff. City Bridge & Transit Co., 216 S. W. 746; Weigmann v. Weigmann, 261 S. W. 758; Zumwalt v. Chicago & A. R. Co., 266 S. W. 717; Stid v. Mo. Pac., 236 Mo. 382; Williams v. Schaff, 288 Mo. 497.]

At another trial plaintiff can so amend its instruction No. 5 as to meet the complaint now made against it by defendant. Plaintiff will no doubt amend its petition to show that deceased was unmarried at his death for if, under the death statute (Sections 3262 and 3264, R. S. 1929), he was married, plaintiff has no right to bring this suit. There is neither pleading or direct proof that deceased was single at his death and, if plaintiff fails to plead this matter in its petition at another trial, no doubt defendant will proceed as was indicated in the case of Katz v. No. K. C. Devl. Co., 14 S. W. (2d) 701.

The judgment is reversed and the cause remanded. All concur.