JEWELL MORRIS, Appellant, v. E. I. DU PONT DE NEMOURS & COMPANY, a Corporation, and MARTIN RAITHEL.—109 S. W. (2d) 1222.

Division One, November 17, 1937.

822

*Karl P. Spencer* and *Francis R. Stout* for appellant.

824

*Abel Klaw, Jones, Hocker, Gladney & Jones, Lon O. Hocker, James C. Jones, Jr.,* and *Arnot L. Sheppard* for respondents.

FERGUSON, C.—The plaintiff was employed as a clay miner by the Parker-Russell Mining & Manufacturing Company in its clay mining operations at Wellsville, Missouri. On April 17, 1929, while engaged in his work of mining clay, and in placing dynamite preparatory to blasting, he was injured by a premature explosion of the dynamite, which resulted in the loss of sight of both eyes, a ruptured ear drum, and other serious injuries about his face, head, and arms. Plaintiff's evidence was well nigh conclusive that the dynamite which thus prematurely exploded had been manufactured by the defendant E. I. Du Pont de Nemours & Company, a corporation (hereafter referred to merely as the Du Pont Company) at its "plant" at Ashburn, Missouri, on the preceding December 26, 1928, and it is admitted that defendant Martin Raithel, employed by the Du Pont Company as "mixing house foreman" at the Ashburn plant "mixed" the dynamite made there on that date. The petition in substance alleges that Raithel "carelessly and negligently" mixed the particular "batch" of dynamite of which the stick that prematurely exploded and injured plaintiff was a part, so that the explosive element, nitroglycerin, was "unevenly mixed with the inert or nonexplosive matter," and that "part of said inert or nonexplosive matter contained more of the explosive element than other parts of said inert

matter, as a result of which that part which contained more of the explosive than the other parts was very explosive, and liable and likely, and would explode upon very slight friction or on a very light blow or slight rubbing against any other object, and would explode if subjected to the friction and handling necessary and incident to its use as an explosive, and in loading it in a drilled hole preparatory to . . . blasting, and in using it for the purposes for which it was manufactured and in handling it as dynamite of the class that it was supposed and represented and labeled to be . . . is ordinarily, customarily and necessarily handled, and that by reason thereof it was dangerous to persons, and in particular plaintiff, handling, being near or coming in contact with it, and by reason thereof it . . . did prematurely explode.'' It is further alleged that ''after so manufacturing it'' Raithel ''negligently and carelessly . . . placed the said dynamite . . . where it would be . . . sold and shipped to the buyer and user thereof; . . .'' that defendants ''knew the said dynamite was mixed improperly;'' that defendant Du Pont Company ''knew or by the exercise of ordinary care would have known, the facts aforesaid, and . . . negligently and carelessly sold the said dynamite'' and ''delivered'' ''and placed it where the public and particularly plaintiff would come in contact with same.'' The petition also states that ''prior to the commencement'' of this action, the mining company ''assigned'' to plaintiff ''its right of action against defendants and authorized plaintiff to prosecute this action . . . in his own name.'' The action was commenced and tried in the Circuit Court of the City of St. Louis. The verdict of the jury was for defendants. Plaintiff appealed from the judgment entered in accordance with the verdict and as the petition alleges and prays damages in the amount of $100,000, the appeal comes to this court.

Plaintiff, as appellant, claims error in instructions given on the part of defendants. Respondents, conceding that, under later decisions of this court, a burden of proof instruction ''of the character'' of their instruction numbered 2 is ''reversibly erroneous,'' say they ''do not purpose to discuss the correctness of the instructions given at their request,'' and, wholly ignoring plaintiff's claim of error in their instructions, contend that the ''judgment should be affirmed for the reason'' a submissible case was not made. If this contention be sustained, and upon the whole evidence, viewed in the light most favorable to plaintiff, it appears that he was not, as a matter of law, entitled to have the case submitted to the jury, it follows that error, if any, in defendants' instructions is immaterial, for ''if plaintiff has no case, he cannot be hurt by erroneous instructions.'' [Shelton v. Wolf Cheese Co., 338 Mo. 1129, 1131, 93 S. W. (2d) 947, 948, and cases there cited.] Necessarily this contention of respondents must first be considered, which requires a review and analysis of the evidence.

The following was shown by the evidence on the part of plaintiff. Plaintiff and other miners engaged in like work at this clay mine were known as "ton loaders." "Ton loading is blasting down clay and loading it in cars" which take it "to the top of the mine." Each "ton loader" worked in a separate "room." The "face of the clay in the mine was about 7 feet high, about 6 feet across the top and about 7½ feet across the bottom." The miners followed a "routine" method of "blasting down" the clay. The miner or "ton loader" would "drill five holes" in the "face of the clay" at certain distances apart, "three bottom holes" and "two others" about three feet above. The holes were "drilled with a breast auger." They "slanted" down at an angle of one foot to three feet and "away from each other," were about four feet deep and one and seven-eighths inches to two inches in diameter. It is pertinent to observe here that a stick of dynamite is one and one-fourth inches in diameter and eight inches in length. As he drilled the hole the miner would "clean it out with a scraper," an iron or steel rod so shaped at one end that it could be used to "clean out the holes." "It took about 10 minutes to bore a hole." Having prepared the holes the miner would move his "tools away from the face of the mine so" that when the explosion occurred "the clay would not cover them." He would then proceed to "load the holes." The "ordinary load in a bottom hole was a stick and a half of dynamite" and "in a top hole one stick." The dynamite with cap and fuse properly placed and affixed was inserted and the stick of dynamite then pushed or propelled into the hole by the means of a wooden tamping stick. There seems to be no controversy about the manner and method followed by these miners in placing the cap, affixing and arranging the fuse and loading the holes, as described by plaintiff, and his fellow miners who were witnesses for him, being a proper and reasonably safe method nor is it claimed that there is anything about such method, if it is followed, that could or would cause dynamite of the kind, grade and explosive percentage in use in this mine, if in normal condition, to explode. For this reason we have not undertaken to minutely describe the various steps in the process and have above referred to the cap and fuse as being properly placed and affixed since the evidence shows that in loading the holes a proper method was followed. Having loaded the holes in the manner described the fuses were lighted. A shorter fuse was used in the "lower holes" and the "lower holes were supposed to go off first and the upper ones follow." "Normally five holes would be fired in a day. This would bring down between 12 and 15 tons of clay. That was the routine."

Plaintiff testified that on the day of the injury he had "loaded the two top holes and the left bottom hole and was loading the bottom hole on the right" when the explosion occurred; that (stating in detail what he did), in loading this hole he proceeded in the usual and customary manner, following the proper method above mentioned;

that he first "pushed a half stick of dynamite to the back end of the hole with a broom stick (the wooden stick or rod which he says he regularly, and on this occasion, used as a "tamping bar" or "tamper"); that the half stick of dynamite went "all the way to the back of the hole and did not meet with any resistance;" that he then properly "prepared the primer or the cap and fuse" (that is, according to the usual and recognized method mentioned, which he states in detail), and affixed and attached same to a whole stick of dynamite; that while he was inserting that stick of dynamite into the hole, using the wooden tamping stick or bar (the broom stick mentioned), and "when the stick of dynamite was between 1 and 2 feet in the hole, it exploded," and that "this stick of dynamite met with no resistance before it exploded." If plaintiff's testimony is fully accepted and believed, and its credibility was for the jury, the conclusion reasonably and necessarily follows that he was loading the hole in the usual and customary way and following a safe and proper method of doing so, and that no negligent or improper act on his part or attending condition, caused the dynamite to explode, but that the explosion resulted from some defect, imperfection, or cause inherent in this particular stick of dynamite.

It is admitted, that pursuant to the order of plaintiff's employer, the Parker-Russell Mining Company, the defendant Du Pont Company sold and on December 27, 1928, made a shipment of dynamite, labeled and purporting to be of a grade and percentage designated by the Du Pont Company as "Red Cross Extra 40%," from its Ashburn, Missouri, plant to the Parker-Russell Mining Company at Wellsville, Missouri; that the dynamite composing this shipment was manufactured at the Ashburn plant on December 26, 1928, and was mixed by defendant Raithel on that date; and that the shipment was received by the Parker-Russell Mining Company at its mine at Wellsville, where plaintiff was employed, on January 2, 1929. This shipment "consisted of about 20 cases." "about a ton of dynamite." Plaintiff's evidence is that the ton loaders, in their blasting operations, regularly and customarily used dynamite of the same strength and percentage as that purportedly composing the Du Pont Company's grade of dynamite known as "Red Cross Extra 40," which made up this shipment. Plaintiff's uncontradicted evidence is that when the Du Pont shipment of dynamite was received on January 2, 1929, the "powder house was empty," and that the mining company had no dynamite on hand or in stock at that time; that this shipment constituted and was the sole and only supply for dynamite used in the mine from that date, January 2, 1929, until May 17, 1929, when a shipment of dynamite from another company was received; and that all the miners, about five in number, engaged in blasting operations were, between the dates mentioned, supplied with dynamite from this shipment. This evidence taken as true, as it must be in determining

whether a submissible case was made, and considered together with the admissions noted, supra, the inference follows that the particular stick of dynamite, which prematurely exploded on April 17, 1929, causing plaintiff's injuries, was from the shipment received January 2, 1929, and was from a "batch" of dynamite manufactured by the defendant Du Pont Company at its Ashburn plant on December 26, 1928, mixed by defendant Raithel.

A case of dynamite was opened the "first day of each week" and the dynamite taken therefrom was distributed to the miners, each of whom had his individual "dynamite box." Apparently no trouble was encountered in the use of this dynamite until about two weeks before the premature explosion in which plaintiff was injured. Preliminary to that which follows we interpolate here that plaintiff's evidence is that the "texture of the clay" and "the clay is practically the same all through the mine." According to the testimony of plaintiff and other miners and employees, connected with the mine, there were, during the period of about two weeks before, as mentioned, and for a time after, plaintiff's injury, numerous instances of unusual, extraordinary and abnormal action of this dynamite. In relating these instances they testified that, though the "clay was the same" and the holes were bored and loaded in the usual way, using the same and the usual quantity of dynamite, varied and unusual results frequently occurred; that, under the same conditions, of clay, loading, and quantity of dynamite used, as stated, at times the dynamite exploded with such violence that the clay was "powdered," "shot fine" and "shot up" so that the men could not use it and some of the supporting timbers of the room "would be blown out, and that is unusual," while at other times, the loads in some of the holes would not explode, or "even when there was an explosion in all the holes" it was so "weak" that it "did not blow the clay down" and after the explosion the "clay would still stick to the face," or the miner would not get as much clay as usual, "only get 8 or 9 tons" when the normal result was twelve to fifteen tons, or he would get only "two or three boxes of clay" when he "ought to get 18 boxes." These witnesses further testified that during the period these unusual and abnormal results occurred they frequently found "unexploded pieces of dynamite in the clay" that was blown down. Plaintiff's evidence was further that the dynamite was not discolored in any way and that there was nothing unusual about its appearance. This was corroborated by defendants' witness, a representative of the Du Pont Company who went to the mine after plaintiff's injury and examined the remainder of the January shipment.

Plaintiff called one, Charles W. Cuno, a consulting chemical engineer, "experienced with dynamite," as an expert witness. Hypothecating all the facts and circumstances shown by plaintiff's evidence as to the manner of blasting followed at this mine, and particularly the method and manner in which plaintiff testified he was loading the

hole at the time of the explosion, and the evidence of the numerous instances of varied, abnormal and unusual action of the dynamite and the results thereof, occurring under the same conditions during the period commencing about two weeks prior to the explosion in which plaintiff was injured, together with other facts developed in plaintiff's evidence, the witness was asked, "assuming such facts, what in your opinion, caused the explosion of the stick of dynamite which injured" plaintiff?" The witness answered: "My opinion is that the dynamite in question was unevenly mixed; in other words, that the explosive part and the nonexplosive or inert ingredients, were not evenly mixed." Upon cross-examination the witness stated: "Under the terms of the hypothetical questions there was nothing else I could see that would cause the premature explosion but that the dynamite was not properly mixed." On cross-examination this witness, explaining the composition of dynamite, stated, that if, in mixing "a batch" of dynamite, the "inert" matter and nitroglycerin, the explosive element, are not properly, evenly and uniformly mixed "some portions of the dynamite from the same batch would be lean in nitroglycerin and the other portions would have too much" with the result that the portions of the dynamite in which nitroglycerin was most highly concentrated would be "hypersensitive." One of defendants' experts, who had gone to the mine at Wellsville shortly after the explosion in which plaintiff was injured to investigate the explosion and examine the remaining dynamite on hand, which had been purchased from the Du Pont Company's Ashburn plant, stated, that sometimes with age and "in dynamite several years old" the nitroglycerin would become "encapsulated in one spot" but in such case there is a noticeable discoloration and that, "I found no evidence of this in the dynamite I inspected at Wellsville. I wouldn't expect to see anything of this kind in four months."

Defendants' evidence described the routine method of making dynamite at the Ashburn plant. The capacity of that plant "was around 50,000 pounds a day." There were two "tubs," each "9 feet across and about a foot and a half high," and two mixing machines. "About 1100 pounds of dynamite" was mixed "at a time in one tub." This was referred to as a "batch." The formula for the preparation of a "batch" directed that first a prescribed quantity of several ingredients, "powdery substances" referred to as "dope," composing the "inert matter," be placed in the tub. The liquid nitroglycerine is then brought to the tank in a two compartment aluminum tank, with rubber wheels. The liquid content of one compartment, supposed to be the proper and prescribed amount or proportion for one "batch" is poured into the tub through a rubber hose, one-half at each side of the tub. The "batch" having been thus prepared in both tubs the mixing machines were started in operation. Five minutes was the time prescribed by the formula for mixing

dynamite of the grade and percentage of that involved. Sometimes but one tub was used, several successive batches being mixed in the one tub. However it is apparent that the entire shipment of a ton of dynamite received by the mining company on January 2, 1929, was not all from one batch but two or more batches. Raithel testified; that it was his custom to time the mixing operation by "an ordinary alarm clock" which stood about ten feet from each tub; that he would "throw in the .clutch and start the tubs and then walk over and take a look at the clock;" that he "didn't make any memo" or "write down" the time he started the tubs but "would just remember it" and when the mixing operation had proceeded, in the case of dynamite of this grade, for five minutes ("some dynamites are mixed longer than others") he "would shut off the tubs;" that "I suppose a person can look at the material at the end of five minutes and determine whether it was properly mixed but I never used that as a guide," but when, as he timed it, the mixing operation had continued five minutes he turned the batch out as properly mixed; that in pouring the nitroglycerin into the tub "I didn't have any actual measure to tell when I had half on one side (of the tub) and half on the other;" that "this particular order was made on December 26, 1928;" that "I don't remember how much of a run of dynamite I mixed" that day; that "I do not remember whether I used the same tub or separate tubs that day;" and, "I don't have any recollection of any different operations on December 26, 1928. Nothing happened to call my attention to anything which was other than routine." Defendants' evidence was that the time prescribed for mixing various grades of dynamite had been determined by tests and the employees engaged in that work instructed accordingly; and that the tests establishing five minutes as a proper length of time for mixing this particular grade of dynamite had been made in 1922 or 1923. There was evidence that "there are iron bars made," and used in some mines and otherwise, "for the purpose of tamping dynamite and defendants had evidence tending to show that at the time of the explosion plaintiff was using an "iron tamping bar." Plaintiff's evidence, it will be remembered, was that he was using a "wooden tamping stick" (a broomstick), which it was seemingly recognized could safely be used in that work under normal conditions. This, however, was but one of the many issues of fact, for the jury, arising out of conflict in the evidence.

Defendants contend, that plaintiff's case rests upon mere speculation and conjecture as to the cause of the explosion, that plaintiff attempts to sustain the charge laid in his petition by basing inference upon inference ("piling inference upon inference"), that there is no sufficient and substantial evidence to support a finding for plaintiff, and therefore a submissible case was not made. In this case, as in most explosion cases, the plaintiff is largely dependent upon cir-

832

cumstantial evidence to show the cause of the explosion to have been as alleged. The question presented is resolved to this, are the facts and circumstances in evidence, most favorable to plaintiff's theory, taken as true, and measured by common sense and experience, sufficient to warrant, as a reasonable deduction therefrom, a finding that the cause of the explosion was as alleged in the petition. We have set out the evidence with more than usual particularity. We have noted that the direct and uncontradicted evidence is that the stick of dynamite which exploded was from a batch of dynamite mixed by Raithel at the Du Pont Ashburn plant on December 26, 1928; that more than one batch of dynamite was mixed that day; and that the shipment to the mining company was the product of two or more separate batches mixed on that day. A case of dynamite was opened and distributed the ''first day of each week'' and when we consider the evidence that prior to about two weeks before this explosion the dynamite acted in a normal and usual way but during that period and after the explosion, though used and handled under the same conditions, in the same and usual manner, it acted in the unusual and abnormal way described by plaintiff and his witnesses, we think it a permissible inference, which a jury, in view of the evidence mentioned as to mixing in separate batches, might reasonably draw that the dynamite used prior to about two weeks before the explosion and that thereafter used was from different batches. We have pointed out, in the course of the foregoing recital of the evidence, that if plaintiff's testimony, and his corroborative evidence, is accepted and allowed its fullest probative effect, as is our duty upon this inquiry, the inference or conclusion logically and necessarily follows that the cause of the explosion was some defect or imperfection in the dynamite. Plaintiff's and defendants' evidence concurred in showing that there had been no ''breaking down'' or deterioration of the dynamite since its receipt by the mining company or concentration of nitroglycerin due to age; there was no discoloration, nor anything about the appearance of the dynamite to indicate such conditions, as would have been the case had they existed. All the evidence, in the aspect most favorable to plaintiff's theory, bearing upon the composition, and the manufacture, of the dynamite, the varied, unusual and abnormal action of the dynamite shortly and immediately before and following the explosion, when, under the usual and ordinary blasting conditions and handled in the usual routine and proper manner, it would at times fail to explode, or the explosion would be very weak, or it would explode with extraordinary, and too great, violence for the grade and percentage it purported to be, considered, together and in conjunction with the facts and circumstances heretofore noted, we think there is a connection, relation, and coincidence in the facts and circumstances in evidence tending to show that in the manufacture of the dynamite, of which the stick

that exploded was a part, the explosive element, nitroglycerin, and the inert matter were not evenly, uniformly and properly mixed, as alleged, resulting in some of the dynamite being overcharged with nitroglycerin, and hypersensitive, while other portions of the same batch were weak or "lean" in nitroglycerin, and to justify a finding that such was the cause of the explosion.

Our conclusion that the evidence, both direct and circumstantial, considered as a whole, and viewed in the light most favorable to plaintiff, amounts to sufficient and substantial evidence to make out a submissible case does not violate the so-called "rule" against basing an inference upon an inference, or piling inference upon inference, which respondents, in their brief, have discussed at length as being applicable in this case. We do not undertake to enter upon an academic discussion of this so-called "rule." As to what is meant by this expression and its applicability, those interested will perhaps find the following authorities informative. [Annotation, 95 A. L. R. 162; 1 Jones Commentaries on Evidence (2 Ed.), p. 528.] In the present case, however, plaintiff's prima facie case is not based upon or pieced out by cumulative inferences, whereby the ultimate finding is arrived at by a process of building inference upon inference, each based solely and alone upon a preceding inference. The pronouncement against an ultimate inference arrived at solely by basing an inference upon an inference "is aimed at inferences drawn solely from previous inferences and otherwise unsupported, so that the evidence becomes too remote." [Martin v. St. Louis-San Francisco Ry. Co., 329 Mo. 729, 736, 46 S. W. (2d) 149, 152.] "There is no limit to the number of inferences which may be drawn in a given case provided each rests upon" and reasonably arises from and out of facts and circumstances shown by the evidence. [State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 121, 28 S. W. (2d) 97, 103; American Veterinary Laboratories v. Glidden Co., 227 Mo. App. 799, 59 S. W. (2d) 53.] Ofttimes, as in the instant case, several inferences may properly be drawn from, and sustained by, the same set or same phase of the facts in evidence and where, as in this case, an analysis shows that though several inferences are necessary to the making out of a prima facie case nevertheless since each is based upon facts and circumstances in evidence the plaintiff is entitled to the benefit of all. We have pointed out the evidence, both direct and circumstantial, which in our opinion is, if taken as true, sufficient to sustain and justify the several inferences. Such inferences may be concatenated and become the basis for an ultimate or final finding of liability. [Allen v. Chicago, R. I. & P. Ry. Co., 227 Mo. App. 468, 54 S. W. (2d) 787; Hardwick v. Wabash Railroad Co., 181 Mo. App. 156, 163 S. W. 328.]

Respondents also make this contention, that plaintiff's "evidence discloses that prior to this accident complaint had been made to the foreman of the mining company regarding this dynamite—therefore the mining company had knowledge of its alleged defective condition, and its negligence in permitting appellant to use the alleged defective dynamite was the efficient cause intervening between appellant's injury and the alleged negligence of the Du Pont Company." First the evidence which is said to show that complaint was made to the foreman prior to the accident is vague and indefinite and it is doubtful that it warrants that construction. It will be recalled that it was dynamite used during a period of about two weeks prior to the explosion and for awhile thereafter that acted in the erratic and abnormal manner described. One fellow miner stated that after the explosion, in which plaintiff was injured, he made a complaint to the foreman about the action of the dynamite being distributed. Another miner said he did not make a complaint to the foreman but "talked to the other boys at the mine about it both before and after the accident." The foreman, on cross-examination, said, "Complaint was made to me that the dynamite didn't shoot the clay out" but he did not say, nor does it appear, that such complaint was made before the accident. This is all, we can recall, appearing in the evidence in reference to complaint to the foreman. If it be assumed that the complaint that "the dynamite did not shoot the clay out" was made prior to this explosion, nevertheless that, standing alone, as it does, hardly seems sufficient to put the mining company upon notice of the dangerous condition which plaintiff's evidence tended to show was inherent in this dynamite. Alone it indicates nothing more than that some of the dynamite was "weak." The knowledge, or extent of knowledge, of the mining company concerning the dynamite, if pertinent, would at most, upon this record be a question for the jury. This contention assumes defendants' negligence in the respect alleged, viz.: improper mixture of the dynamite, so that the explosive element was not evenly and uniformly mixed or proportioned with the inert matter, and delivery of this known inherently dangerous substance to the mining company with knowledge of the use for which it was intended, and assumes also that the sole complaint concerning the dynamite set out was made to the foreman prior to this explosion. Such does not present a situation from which it follows, as a matter of law, as respondents would have us declare, that the act of the mining company in distributing the dynamite to plaintiff and other miners constituted an intervening efficient cause which must be regarded as the proximate cause with defendants' negligence as too remote. If the act of the mining company in distributing the dynamite be considered a contributing cause or intervening cause it would nevertheless not relieve defendants of liability where their prior negligence was the efficient cause, and the

injury is the natural and probable consequence of the original negligent act or omission, "and is such as might reasonably have been foreseen as probable." [45 C. J., p. 926; Kentucky Independent Oil Co. v. Schnitzler, 208 Ky. 507, 271 S. W. 570; Teasdale v. Beacon Oil Co., 266 Mass. 25, 164 N. E. 612; Ferraro v. Taylor, 197 Minn. 5, 265 N. W. 829; Katalla Co. v. Johnson, 202 Fed. 353.]

██ There was evidence that a wooden tamper or tamping stick fashioned from a broomstick, was found intact in plaintiff's "room" after the explosion. It presumably had been "blown out of the hole" by the explosion. This tamping stick was introduced in evidence and has been produced here. It was identified by plaintiff as the stick he was using at the time and which he had been regularly using as a tamping bar for some time prior thereto and as to this plaintiff adduced strong corroborative evidence. That this stick was not broken, was intact, and its appearance, respondents argue constitute irrefutable proof that plaintiff was not using it at the time but was using instead an iron tamping bar as defendants' evidence tends to show. Defendants did not plead contributory negligence but, as respondents, ask us to declare the direct and positive testimony of plaintiff, and his witnesses, to be "incredible" and "so wholly contradictory to mankind's common experience, that no credit whatever can be given to it," and also that the evidence conclusively shows that plaintiff used an iron tamping stick and was therefore guilty of contributory negligence as a matter of law. "Only in those extraordinary cases where deductions from physical laws and facts so clearly and irrefutably disprove the testimony of witnesses that reasonable minds may not entertain any other conclusion are courts justified in ruling sworn testimony inherently unbelievable and impossible." . [Dempsey v. Horton, 337 Mo. 379, 384, 84 S. W. (2d) 621, 624, and cases there cited.] The result and specific effect of an explosion of dynamite, under the circumstances shown in evidence, is not so certain and undisputable that we can say as a matter of law that plaintiff's testimony is contrary to well known physical laws and incredible. There was evidence pro and con and the questioned stick was in evidence. We think the evidence about it makes an issue of fact for the jury. Nor do we find merit in respondents' further contention, that, though they did not plead contributory negligence as a defense, plaintiff's evidence shows that he had such knowledge of the defect in the dynamite, now relied upon as the ground of defendants' liability, that his use of the dynamite, in this instance, constituted contributory negligence was a matter of law.

▪██ Defendants' Instruction 2, on burden of proof, telling the jury, "If . . . you find that the evidence touching the charge of negligence against defendant to be evenly balanced, or the truth as to the charge of negligence against defendant remains in doubt in

your minds, . . . your verdict must be for the defendant," has been held, by this court, to be reversible error, as imposing a greater burden of proof upon plaintiff than the law requires in civil cases, and respondents concede the instruction to be "reversibly erroneous." See Sheehan v. Terminal Railroad Assn. (En Banc), 336 Mo. 709, 81 S. W. (2d) 305; Aly v. Terminal Railroad Assn., 336 Mo. 340, 78 S. W. (2d) 851; Koebel v. Tieman, etc., Co., 337 Mo. 561, 85 S. W. (2d) 519; Grimes v. Red Line Service, 337 Mo. 743, 85 S. W. (2d) 767; Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58; and Nelson v. Evans, 338 Mo. 991, 93 S. W. (2d) 691, where the wording "remains undetermined" was substituted' for "remains in doubt."

Appellant complains of defendants' Instruction 5. The instruction reads: "The Court instructs the jury that if you are unable to determine from all the evidence whether the explosion of the dynamite mentioned in the testimony was caused by some defective mixing of the ingredients of the dynamite, if you find that there was a defective mixing of the ingredients of the dynamite, or whether it was caused by plaintiff's use of the iron or steel bar mentioned in the testimony in tamping the same, if you find he did so use said bar, then plaintiff is not entitled to recover, and your verdict must be in favor of both defendants." We think the instruction misleading and confusing. There was some evidence tending to show that the use of an iron or steel tamping stick in loading a hole was not considered as safe a method as the use of a wooden stick. As we recall there was evidence that when there was "flint rock" in the hole a spark might be caused by an iron or steel bar, used as a tamping rod, coming in contact with the rock, but plaintiff's uncontradicted evidence is that this hole was in a clay formation, that no rock was encountered or present in the hole and there was no evidence whatever of such condition. There is no evidence that the use of an iron tamping bar in merely propelling or pushing a stick of normal dynamite of this grade into a hole under the conditions shown in evidence was alone sufficient to, or might, could, or would, cause dynamite, in its normal condition, to explode yet the instruction apparently assumes that as a fact. The instruction might also be understood, as in effect, telling the jury that though the dynamite was defective in the respect alleged, if plaintiff used the iron or steel bar, and they are "unable to determine" whether the defective condition of the dynamite or the use of an iron bar caused the explosion then they must find for the defendants. If the dynamite was defective, as alleged, then under all the evidence that was the cause of the explosion. If the use of an iron bar was another and contributing cause it would not under the pleadings and evidence defeat recovery by plaintiff unless it amounted to contributory negligence as a matter of law which would require a directed verdict and would not be

an issue for the jury. (Contributory negligence was not pleaded as a defense in this case). Therefore, the instruction seems susceptible of the construction, and to be calculated to convey the impression, that though the alleged defect in the dynamite caused the explosion, if plaintiff used an iron bar and that was a contributing cause plaintiff cannot recover.

Respondents have not attempted to defend their instructions. Some are repetitious and we are inclined, from a cursory examination, to think that their instructions 3, 4 and 6, under the evidence in this record are perhaps properly subject to some of the criticisms leveled at them by appellant, however, as another trial must be ordered, for errors in instructions noted, and conceded, we assume that on such trial instructions following the evidence, as then adduced, will be so framed as to obviate the criticisms now made. Respondents conceded that if we hold, as we have, that appellant made a prima facie case their burden of proof instruction contains reversible error under the later rulings of this court. It therefore follows that the judgment must be reversed and the cause remanded. It is so ordered. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.