EMMA BEABER, APPELLANT, v. J. M. KURN ET AL., RESPONDENTS.—
91 S. W. (2d) 70.

Kansas City Court of Appeals. February 17, 1936.

*Allan R. Browne, Ralph E. Griffith, Grover, Browne & Ennis* for appellant.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts,* and *I. M. Lee* for respondents.

BLAND, J.—This is an action for wrongful death. There was a verdict and judgment in favor of the plaintiff in the sum of $7500. Defendants filed a motion for a new trial, which the court sustained. Plaintiff has appealed.

The facts show that defendants are trustees in charge of and operating the railroad of the St. Louis-San Francisco Railway Company; that plaintiff is the widow of one William Beaber who was killed on March 29, 1934, in that part of Kansas City known as Sheffield, by falling or being pulled from the side of a box car on a freight train operated by the defendants.

The facts further show that the servants of the defendants had brought from a distant part of the city a train consisting of thirty-four empty box cars, a caboose and an engine, intending to store the cars in their Coburg yards in the east part of the city; that the train was proceeding southwardly and had about reached a point where it was the intention of the operators thereof to stop and back it up toward the north in order to go from the main line track on to the switch track leading to the Coburg yards; that the train was in charge of one Lawhon as conductor who, with one House, a switchman, was riding in the caboose; that one Timmons, another switchman, was riding in the engine with the engineer and fireman; that deceased was employed by the Sheffield Steel Company, whose plant was located a short distance east of the point on defendants' tracks where he was killed.

Plaintiff introduced as a witness, one Moffat, who testified that he was employed by the Sheffield Steel Company; that about 12:30 or 1:00 A. M. of the morning in question he, in company with a fellow employee, one Burris, had gone to McDougall's restaurant, located a few doors east of the railroad, on their way home from work and there they met deceased; that the latter had not worked that night but was to go to work the next day. The witness did not know how long deceased had been in the restaurant. However, the three remained there for about an hour, during which time all of them drank some beer and Burris and the witness had some lunch. All three left the restaurant together and when they got outside the witness told deceased that he would take him home. It appears that the witness had an automobile parked just west of the restaurant and across the railroad track. Deceased lived in another

part of the city. The witness wanted deceased to go home but the latter stated that he desired to go back and get another drink and that he would then go home by taxi. The witness wanted deceased to go home because he "thought he had had enough (beer) he had to go to work the next morning . . . it was getting pretty late in the morning. We was going and I thought we would take him home."

The witness further stated that he did not know how much deceased "had been drinking;" "but he was not intoxicated, in my opinion." Finally deceased decided to go on home and started east toward the train, which was then passing at the rate of about three miles per hour. He said something that the witness could not understand. Deceased started to walk fast as though he intended to board the train and the witness tried to stop him. The witness took hold of him and there was a scuffle. Deceased broke away from the witness and got upon the stirrup and grab iron or ladder on the front end of the box car then passing (the 25th car from the engine). Deceased "got hold of the ladder of the car with his feet on the lower strap (stirrup), caught it somewhere on the order that a switchman would catch a train." . . . His body (was) in (a) somewhat crouched position, his feet out kind of down like that (indicating) and his hands up in a kind of a crouch as a switchman or brakeman would ride a car." Deceased's hips "projected out."

About fifty feet south of where deceased boarded the train there was a tool house on the east side of the track and about twenty feet south of the tool house was a tall white pole that had been used for a stop sign or a mail crane. About sixty feet south of the white pole was a switch stand. These objects were all east of the track. Across the track, and on the west side thereof, a short distance south of the switch stand, was an abandoned passenger station located near the railroad track.

As the engine passed the tool house Timmons alighted for the purpose of assisting in stopping and backing the train from the main line over the switch in question. Deceased had not boarded the train at this time. Seeing the men scuffling Timmons went to where they were and, according to Moffat's testimony, he said, "keep that man off there," meaning to keep deceased off of the train. Moffat testified that he was trying to keep deceased off of the train because "we had been drinking a little beer. I just didn't figure he had any business to get on the train;" that the train was not going in the direction in which deceased lived.

Timmons returned to the vicinity of the tool house and the train moved on south with deceased upon it. Moffat testified that when deceased on the train reached a place ten or twelve feet north of the white pole "Timmons placed his hands on his (deceased's) body somewhere close to his hips" and "he went along with Brunck

(deceased) for a distance of several feet; that to say how hard he pulled or what he done, it is almost impossible to describe just what he did do, as he came into a shadow after following him, oh, I will say just a few feet, maybe ten or twelve, there seemed to be a shadow appear there where we couldn't see the brakeman or Brunck (deceased) either one;'' that this was the last time the witness saw deceased until the latter was found injured between the tracks under the coupling of two cars.

Moffat further testified that he could not tell whether Timmons ''was pulling or dragging (deceased) or what;'' that the two became enveloped in a shadow when they reached the white pole and at that time Timmons still had his hands on deceased; that after deceased was run over the police were called and Timmons ''told the police that he had hold of Bill (deceased) and to say exactly how strong he pulled, his statement is almost on the order of that; that is, to the effect that he wanted him off the train. Q. Pulled him off? A. He didn't say 'pull.' He said, 'take him off;' '' (the testimony just quoted was not objected to) that after they became enveloped in the shadow he saw Timmons going east emerging from the shadow with a lantern in his hand; that when Timmons got about twenty or twenty-five feet from the train he signaled to the engineer with the lantern. The track was level but there was a curve in it some distance south of where deceased was injured and it was necessary for Timmons to go to the east of the train in signaling the engineer in order that the latter might see the lantern.

Moffat further testified that the train came to a complete stop after going about sixty or seventy feet after the signal was given; that after the train stopped the witness and Burris ''went down and met'' Timmons and the latter said: '' 'Where is that guy?' I said, I answered something that 'I don't know,' or 'let's look for him;' '' that they then started south along the east side of the train and when they got about half a car's length of deceased they heard him moaning; that deceased ''was under the coupling of the two cars with his head close to the west rail and his body, or his feet, going east. He was laying right between the rails with his head close to the west rail;'' that one of his legs had been cut off and lay east of the track and the other was nearly severed. Deceased was unconscious and never regained consciousness and died that afternoon in a hospital.

Plaintiff's witness, Sharp, testified that he was one of the police officers who came to the scene immediately after the casualty; that he found deceased lying between the tracks under the cars in a large pool of blood about five or six feet northeast of the corner of the abandoned station.

Timmons testified that after he cautioned Moffat and Burris to keep deceased off of the train the witness turned around and walked south to his former position in front of the tool house, facing north, where he expected to receive a signal from the trainmen who were at the rear end of the train; that he noticed deceased hanging on the car; that the witness "walked backward, with my hand on him, asking him to get off, get off, he might get hurt: 'You better get off, you might get hurt,' or words to that effect;" that "as I approached that switch stand, it being dangerous to walk backward past there, I stopped there; then I got a signal from the rear end, and I walked over east, the length of this shanty (tool house) which is about thirty or thirty-five feet, and gave our engineer a stop sign, then I heard this man (deceased) 'holler,' and as he (the engineer) stopped I walked back thirty-five feet, I should judge, to the track, and I met his (deceased's) two companions walking south along the track, and then we could hear this man (deceased) the closer we got, say, 'Give me a drink of water.' And I says to one of the fellows, 'I think we've hurt him,' but I didn't know whether he was under the cars, outside or where, but he was wanting a drink of water, and I went along and they went along, and I was shining my electric light along until we discovered him between the rails;" that the "holler" he heard "was kind of a scream" from the deceased; that the train was moving about three miles per hour at the time he gave the stop signal and that when he heard the scream its speed had been reduced to about two miles per hour, "It was practically stopped" and shortly thereafter it did stop; that deceased was lying between the rails about sixty feet south of the white pole; that the train moved about forty feet after he heard the scream; that about thirty seconds elapsed from the time he last saw deceased and until he heard him scream; that he gave the stop signal about four or five seconds before he heard the scream; that he did not give an emergency stop signal but the ordinary stop signal and it was given merely to relay the signal given to him by the trainmen at the rear end of the train. The undisputed evidence shows that these men at the rear did not know anything about the casualty until after it had happened.

The conductor testified that it was he who gave the signal for the purpose of stopping the train so as to back it over the switch into the Coburg yards.

Timmons stated that during the time he had hold of the deceased the latter was firmly on the car with his feet in the stirrup, which was about a foot wide and immediately under the hand hold, which was about eighteen inches wide; that the nearest part of the handhold was about four inches from the south edge of the car; that deceased "was holding tight and both feet in the stirrup and both hands a hold, give him all 4 corners braced; he was steady there.

Q. Securely on? A. Yes, sir. Q. Were his hands apart on the grab iron? A. They seemed to be;'' that before the witness touched deceased the latter did not appear to be unsteady; **that the further-most point of deceased's body projected about two feet out from the car;** that he did not pay any attention as to whether deceased's body "was up close to his hands or close to his heels" but the witness was of the opinion that his arms were bent and that he was holding his chest close to the car; that there was nothing along the track close enough to decease to strike him; that he first took hold of deceased at the southwest corner of the tool house; that, "It seems that I touched him on the hip here (indicating), punched him like that (indicating) and said, 'come on and get off there now, you're going to get hurt;' '' that "I repeated that sentence, possible 3 times. Q. And all that time you were walking along with the car? Q. A brisk walk, would that be a fast walk? A. Not a fast walk; I was walking backwards;'' that he was merely trying to attract the attention of the deceased as the latter was facing the car with his back to the witness; that deceased did not move when he punched him on the hip but the witness could hear him "mumbling" loudly as the train was making considerable noise; that he did not put his arm around deceased's waist; that he punched him in order to attract his attention; that "my arm may have went 3 or 4 inches around the side of his body there, I don't know. Q. You mean 3 or 4 inches toward the front of his body? A. It may have, but it wasn't constantly on him; I took it off 'and returned it; it might have went partly around him. Q. You said 3 or 4 inches, and just for the record that is towards his stomach? A. Towards his stomach. Q. Did you use a little force in that? A. No, sir;'' that it was 120 feet from the place where the witness last saw deceased before he fell to where he saw deceased after the latter was injured; that he had received the stop signal from the rear end of the train while he was cautioning deceased about getting hurt; that the train moved forty feet from the time the witness first began punching deceased until the witness started to walk out to give the signal to the engineer. Timmons further testified that his instructions from his employers were to keep the public off of the train; that his instructions were to stop the train before he was to "get them off."

The witness' theory as to how deceased was hurt was that, while the witness did not see how it occurred, "I amagine the slack of the cars when they stopped, the weight of his body swung him around the end of the car."

Lawhon testified that there is a slack of from four to six inches between freight cars being pulled and when the train makes a stop the cars run together "and maybe they will bounce back and maybe come ahead again;'' that even experienced men riding on the side

of a box car, "may be thrown from the train and thrown around the end of the car and on to the track by the surging and jerking of the train brought to a stop, particularly where there are as many as thirty-five cars, as there were in the train in question."

Plaintiff testified that deceased was twenty-six years of age; that he was an able bodied man in good health and was earning $25 per week at the time of his death; that she was twenty-three years of age and that they were the parents of two children, a girl eleven months old and a boy four years of age; that on the morning of the day deceased was injured, and after that event, she went with her sister to the Sheffield Steel plant seeking someone to give blood for a transfusion for her husband; that she passed along where her husband was injured; that she saw blood on the east rail and between the rails near the white pole and at the same place she saw a small piece of flesh and a piece of her husband's blue serge suit; that at the switch stand there was a large pool of blood; that "there were spots of blood from the first place that I saw the blood up to that big pool of blood that the greater part of the blood she saw was near the switch stand which "is a little bit north of the station;" (there was other evidence that the largest pool of blood was where deceased was found after the casualty) that deceased formerly worked at icing freight cars and in the performance of his duties in that work he had "quite a habit of riding freight cars. He would hold to the ladders on the side of the box cars."

Plaintiff's sister testified that she accompanied her to the scene of the casualty on the morning of its happening, arriving there about eight A. M.; that the witness saw blood on the tracks at the white pole; that this was the first place blood appeared going from north to south; that "you could see quite a bit of blood all up and down the tracks there. You could see where Beaber had been 'drug until the train stopped' and then there was another great big clot of blood up at the end where it stopped, which is at the switch standard marked 'B' in defendants' Exhibit D2. At the first blood spot, at the white post, I saw some blood and a piece of flesh and a piece of blue serge suit torn out of Beaber's suit. I recognized the blue serge piece as from his suit."

On cross-examination she testified: "The blood was on the rail, part of it having dropped down on the side of the rail and there was a wooden tie across. Blood was not on the top of the rail. It was right down on the tie and was on the east side was where I saw the greatest amount of blood covering a pretty big space. This pool of blood would cover more space than defendants' Exhibit D2. I saw other blood by the switch standard. It was on the east side of the track, too, and on the same rail as the other blood. It was a smaller amount and was about right opposite the switch standard. There was no more blood except in those two places, except you

could see just a little bit where it dragged him along. It looked to me like the train had just dragged him. It looked to me where the blood was as if the train had dragged him. The blood indicated this to me.''

Burris did not testify.

Complaint is made of the giving of plaintiff's Instruction No. 2, as amended by the court, which reads as follows:

''The court instructs the jury that if you find in favor of the plaintiff, Emma Beaber, and against the defendants, J. M. Kurn and John G. Lonsdale, trustees of the St. Louis-San Francisco Railway Company, if so, you will, in assessing her damages, award her such sum, if any, not less than $2,000.00 nor exceeding $10,000.00, as you find from the evidence will fairly and justly compensate her for the necessary pecuniary loss, if any, which you find from the evidence she has sustained, or will sustain, as a necessary result of the death of her husband, William Beaber, and in considering such pecuniary loss, if any, you may consider the initial burder, if any, falling on plaintiff, Emma Beaber, by reason of the said William Beaber's death, of supporting their minor children until they become of age during the time plaintiff's husband would probably have lived and supported the children during their minority, if so, and if any.''

It is admitted that this suit is brought under the first section of the death statute, section 3262, Revised Statutes 1929, or the penalty section. It has been held that this section does no provide for damages for pecuniary loss, but for a penalty. However, it is also held that the jury, in assessing the penalty, may take into consideration the pecuniary loss suffered by the plaintiff. But the pecuniary loss is not the sole criterion but only a fact to be considered with others and the importance to be given it in determining the amount of the recovery should be left to the unfettered discretion of the jury. [Cummins v. K. C. Public Service Co., 334 Mo. 672, 681; Treadway v. United Rys. Co., 300 Mo. 156, 177.]

It will be noted in the instruction under consideration the only criterion given to the jury, in fixing the amount of recovery is the pecuniary loss suffered by the plaintiff, the instruction stating, that the jury ''will, in assessing her (plaintiff's) damages award her such sum, if any, . . . as you find from the evidence will fairly and justly compensate her for the reasonable pecuniary loss,'' etc.

An instruction in substantially the same form was held to be erroneous in the Treadway case. It is true that the holding in that case was based upon two grounds and that the first ground, in effect, has been overruled by subsequent decisions of the Supreme Court. The first ground was that the instruction there considered was erroneous because it referred to plaintiff's recovery as ''damages,'' when the cause of action was not for damages but for a penalty. In this connection it has been held, since the Treadway case, that an

instruction in cases of this kind in the following form, is not reversible error:

"If the jury find for the plaintiff they will assess the damages at not less than $2,000, nor more than $10,000 at the discretion of the jury."

[See, also, McDaniel v. Davis, 266 S. W. 710, 711; State ex rel. v. Bland, 331 Mo. 246, 255, 256.] In the case last mentioned the court intimated that, under some circumstances, the giving of such an instruction might be error but what these circumstances would be is not indicated or intimated in the opinion. But, however that may be, the Supreme Court has always adhered to the second ground given in the Treadway case, for holding the instruction in that case to be erroneous. In this connection the court in that case said, l. c. 177:

"In the second place the instruction told the jury in effect that they must assess plaintiff's damages at a sum that would compensate him for his pecuniary loss, whereas, they should have been left free to assess it at a smaller amount had they in the exercise of their discretion seen fit to do so. Plaintiff's pecuniary loss was in no sense the measure of his recovery. While his award under the facts in this case could reasonably have equalled or exceeded the amount that would compensate him for his pecuniary loss, it could just as reasonably have been fixed at a lesser sum, in the discretion of the jury. We held in Grier v. Railroad, supra, that the jury in assessing the penalty against the defendant for wrongful death under Section 4217 may properly take into consideration the pecuniary injury inflicted upon plaintiff. We so hold now. But such injury is but one fact to be considered with others, and the importance to be given it as a factor in determining the amount of the penalty should be left to the unfettered discretion of the jury."

This language has been recently approved by the Supreme Court in the case of Cummins v. K. C. Public Service Co., supra.

We have examined plaintiff's cases and find them not in point. In Ward v. Mo. Pac. Ry. Co., 277 S. W. 908, the instruction merely told the jury "you *may* take into consideration the pecuniary loss" of plaintiff, etc. The instruction in the case at bar states, in effect, that the jury must not only take into consideration plaintiff's pecuniary loss but must compensate her for that loss. The instruction in the case of Wilkerson v. Mo. Pac. R. Co., 69 S. W. (2d) 299, was similar to the one in the case of Ward v. Mo. Pac., supra. We have examined the other cases cited by plaintiff and find them not in point.

However, it is insisted by the plaintiff that, in view of the small verdict, there was no reversible error in the instruction. In this connection it is pointed out that the evidence would support a

verdict for pecuniary loss in a sum several times the amount returned. This contention is substantially answered in the Treadway case where it is said, in effect, that it was in the discretion of the jury to award plaintiff less than the pecuniary loss sustained.

It is claimed that there was no exception to the giving of the instruction. The court granted a new trial on the ground that it erred in the giving of the instruction. Therefore, it is unnecessary for the record to show an exception. [McCombs v. Bowen, 73 S. W. (2d) 300; Beer v. Martel, 332 Mo. 53.] However, it is insisted that the objection, as contained in the motion for a new trial, to the giving of this instruction, was not sufficient to preserve the point. The motion for a new trial in this respect reads as follows:

"Because the court erred in giving instructions and each of them, given by the court of its own motion, over the objections and exceptions of the defendants."

This was sufficient objection to the giving of the instruction to preserve the matter. [Wampler v. Railroad, 269 Mo. 464; State ex rel. v. Reynolds, 278 Mo. 554; Bobos v. Krey Packing Co., 317 Mo. 108.] The holding of this court in Kelly v. K. C. Bldg. & Loan Assn., 86 S. W. (2d) 975, is not in harmony with the decisions of the Supreme Court upon this question and that case, so far as it relates to the point now in question, is overruled.

It is insisted by the defendants that, as the case may be retried, it is proper to pass upon points raised by them in support of the action of the court in granting a new trial. In this connection it is claimed by the defendants that the court properly granted a new trial for the reason that their instruction in the nature of a demurrer to the evidence should have been given.

The petition alleges that deceased was injured by the act of the defendants and their servants in that they "negligently, willfully and intentionally put their arms and hands around and upon" deceased, . . . negligently, willfully and intentionally pulling and jerking and negligently, willfully and intentionally unbalancing and negligently, willfully and intentionally causing deceased to lose his balance, hold and footing upon the side of the box car" and to fall from the car on or near the tracks, resulting in his being run over by the train.

It is claimed that the demurrer should have been sustained because there is no evidence tending to show "that Timmons exerted any force whatsoever upon the deceased or was in anywise responsible for his injury."

It is true that no witness saw Timmons exerting any force upon the deceased which was calculated to cause the latter to fall from the car. At the time Moffat last saw deceased Timmons had his hands upon him but what happened thereafter only Timmons knew. It is true that Timmons testified that he did not pull deceased from

the car or, in fact, handle him in such a way as to cause him to fall but that he put his hands upon deceased and punched him merely to call his attention to the fact that he, as one of the trainmen (and not one of deceased's companions), desired that deceased get off of the train.

However, taking the evidence in its most favorable light to plaintiff, a strong case of circumstantial evidence was made out tending to show that deceased got off of or fell from the train as a result of the conduct of Timmons. While it was the duty of the plaintiff to establish this and to make out a prima facie case and not the duty of the defendants to advance a more plausible theory as to how deceased met his death, the evidence, taken in its most favorable light to the plaintiff, fails to disclose any reasonable theory other than that deceased was removed or fell from the train as a result of the acts of Timmons. The only suggestion by defendants as to how deceased might have come to his death is not in accordance with the evidence taken in its most favorable light to plaintiff. In this connection defendants state that it is more likely, by reason of the fact that deceased was in a crouched position on the car with his feet and hands only three and a half feet apart and the grab iron was only four inches from the end of the car, that deceased was swung around the end of the car between the one he was on and the next one and fell as a result of the car he was on jerking by the slowing down or stopping of the train; that it is not in accordance with the law of physics that he could have gotten on the tracks in any other way as the overhang of the car was eighteen inches or two feet (as testified to by Lawhon) and the pulling or dislodging of a man on the side of the car would not result in his getting directly under the wheels of the train.

The argument that deceased was thrown around the car by a jerking caused by the slowing down or the stopping of the train is not substantiated by the evidence taken in its most favorable light to the plaintiff. By reason of the presence of blood, skin and a part of deceased's clothes located on the track at the white pole, the jury could say that he fell from the train either at that place or slightly north thereof. The evidence, taken in its most favorable light to plaintiff, shows that no effort was made by Timmons to signal the engineer to stop the train until it had gone several feet south of this point. Timmons testified that he first put his hands upon deceased when the latter had reached a point opposite the southwest corner of the tool house. This, according to other evidence, was twenty feet north of the white pole. Timmons further testified that the train moved forty feet from the time he first began punching deceased until the witness started to walk out toward the east to give the stop signal. Therefore, the jury could find that the point on the car where deceased had theretofore been riding

was twenty feet south of the pole at the time Timmons began walking toward the east for the purpose indicated. He stated that he walked at an ordinary rate of speed for a distance of thirty or thirty-five feet before giving the stop signal and during this time the train was proceeding at the rate of three miles per hour. As an ordinary rate of speed is likewise three miles per hour, the train must have proceeded thirty or thirty-five feet while Timmons was walking out to the place where he gave the stop signal. Timmons testified that the train began to stop almost immediately after he gave the signal. At any rate, according to the testimony, the point of the car upon which deceased had been riding must have been at least fifty feet south of the white pole at the time the train began to stop. As before stated, there is evidence that deceased had left the car at or before the time he reached a point opposite the white pole. Consequently the jerking of the train, as a result of its slowing and stopping, followed the stop signal given by Timmons, had nothing to do with deceased's falling off of the train. Nor was the jury, under all of the circumstances, required to believe the testimony of Timmons and the other trainmen when they stated, to the effect, that the signal that Timmons gave was an ordinary stop signal, and not an emergency one, but was given as the result of a signal from Lawhon to stop the train in order that it might be backed over the switch into the Coburg yards. If deceased fell from the car at the time it reached the white pole, which was after Timmons put his hands upon him, then Timmons knew the cause of the fall and, of course, knew that he had fallen, and it is reasonable to suppose that he attempted to stop the train for this reason. In this connection there was testimony that Timmons asked Moffat and Burris concerning the whereabouts of the deceased when they came up after the accident. Notwithstanding the fact that he had already heard deceased scream he said nothing about it.

It is further claimed in this respect that it is more reasonable to suppose that the intoxication of deceased was the cause of his falling from the train, but this was clearly a question for the jury. The evidence taken in its most favorable light to the plaintiff shows that deceased was not intoxicated. It is true that he had been drinking beer but there is no evidence that he partook of any hard liquor. While it would appear that he had been influenced by his drinking to the extent of causing him to indulge in horse-play, that is, boarding the passing freight train when he had no occasion to do so, the fact that he was able to get upon the train with his feet in the stirrup and his two hands on the grab hold and there to be and remain in a secure position, as testified to by Timmons, would indicate that he was not so far under the influence of liquor that he could not remain on the train under ordinary circumstances.

While defendants say that the manner of deceased being on the car with his body protruding out about two feet made his position an insecure and precarious one, there is evidence that this was the usual position taken by a trainman and that deceased was securely on the train. There also was evidence that he had experience in riding on trains in this fashion.

As before stated, the evidence taken in its most favorable light to plaintiff, made out a strong case of circumstantial evidence in her favor tending to show that deceased was caused to fall from the train by the pulling, punching or rough handling of Timmons, causing deceased to lose his hold on the car and fall. We do not think that any law of physics is involved in the claim made by the defendants that had deceased fallen from the side of the car he could not have gotten his legs under the wheels of the train. It is impossible to say just where a man would likely get to in falling in such a manner. If his feet left the stirrup before his hands were loosened from the hand-hold he might very well get his feet under the body of the car in an effort to regain his position on the stirrup. This whole matter was one for the attention of the jury. In holding as we do, it is unnecessary to build inference upon inference as contended by defendants. It is well established that as many inferences as the facts establish, either by direct or circumstantial evidence, may be drawn as those facts will justify so long as one inference is not based upon another inference or inferences. [Freeman v. K. C. Public Service Co., 30 S. W. (2d) 176.] Here we have established the fact that there was blood, skin and clothing on the track where it passed the white pole. We also have direct evidence that at that time Timmons had his hands on or partly around deceased and was punching him in an effort to get deceased off of the car. We infer from the evidence of blood, skin and clothing on the track that deceased was run over at or near the white pole as there was evidence on or about the track to indicate that his fall did not occur prior to that time. We infer from the fact that Timmons was attempting to get him off of the car and was doing the things indicated, supra, that it was the result of the acts of Timmons that deceased fell, in the absence of any other reasonable explanation, suggested by the testimony, that the jury was bound to believe. The fact that he fell and was run over is established by direct and circumstantial evidence.

We have not overlooked the rule relied upon by defendants that where the evidence shows the death may have resulted from one or two causes, for one of which, but not the other, defendant would be liable, plaintiff must show with reasonable certainty that the cause for which defendant would be liable was one of the proximate causes of the injury. In other words that it must be shown with reasonable certainty that the cause of the injury was due to the negligence of the defendant and that this will not be left to spec-

ulation. However, the rule goes further than this and is to the effect that plaintiff's evidence need not exclude the possibility of accident or of a cause for which defendant is not liable, but it is sufficient to make a submissible case if there is substantial evidence that the injury resulted from a cause for which defendant is liable. [Am. Vet. Lab. v. Glidden Co. et al., 59 S. W. (2d) 53, 60.] From the theory of the facts that we have evolved, supra, it is quite apparent that there was ample evidence of a substantial nature to fix liability on the defendants in this case. [Daly v. Pryor, 197 Mo. App. 583; State ex rel. v. Haid, 325 Mo. 107; Freeman v. K. C. Public Service Co., supra; Murrall v. K. C. St. L. & C. R. Co., 213 S. W. 964; Lynch v. Chi. & Alton Ry. Co., 208 Mo. 1.]

It is insisted by the defendants that the court erred in giving plaintiff's Instruction No. 1, covering the entire case and directing a verdict. This instruction submits to the jury the language of the petition in reference to the theory of plaintiff as to how deceased fell from the car. That is to say, it had the jury find that one of the employees of the defendants "negligently, willfully and intentionally" put his arms and hands around and upon deceased, etc. It is claimed by the defendants that in using the words, "negligent, willful and intentional acts on the part of the employee of defendant, the court submitted an absolute contradiction and impossibility," because an act may not be wilful or intentional and at the same time, negligent.

There was no attack made upon the petition at or before the trial. We think there was no error, in the respect claimed, committed by the giving of plaintiff's Instruction No. 1. [Waechter v. Railroad, 113 Mo. App. 270; Troxell v. DeShon, 279 S. W. 438; McKenzie v. Randolph, 257 S. W. 126; Reel v. Consolidated Inv. Co., 236 S. W. 43; Meyers v. Adler, 188 Mo. App. 607.] The case of Bindbeutal v. St. Ry. Co., 43 Mo. App. 463, cited by the defendants is not in point. Both the instructions and the facts in that case were different from the instruction and the facts in the case at bar.

Defendants admit that the error committed by the trial court in giving the instruction on the measure of damages can be cured by requiring a *remittitur* of all of the original judgment save and except for the sum of $2000. Consequently, if within ten days, plaintiff will file a written *remittitur* so as to leave the original judgment at $2000, the judgment granting a new trial will be reversed and the cause remanded with directions to the circuit court to enter a judgment in that sum. Otherwise, the judgment will be affirmed and the cause remanded for a new trial. *Shain, P. J.,* concurs.